William A. Coit et al., Appellants, v. Samuel W. Patchen, Executor, etc., et al., Respondents.

Probate of the will of E was contested on the ground of incompetency, by reason of delusions as to the conduct and affection of her husband, and as to the want of affection toward her of some of her children, among others, that they desired to confine her in an asylum; whereby she was induced to make discriminations against them. It appeared that the testatrix was a woman of strong will; she had a severe sickness some years prior to making her will; she continued, however, thereafter, to manage and control her business as she had done before, collecting rents and making improvements; she conversed intelligently with her friends and her attorney, giving instructions to the latter as to her will, and following in some respects his advice. No act of insanity or of improvidence in the conduct of her affairs was proved. She was passionately jealous of her husband, and they had frequent quarrels; at one time a divorce suit was pending between them. Her son had committed an assault upon her, for which he and her husband were indicted, and the former convicted. The children, who were discriminated against, took sides with the husband; those favored, espoused the cause of the mother. Proceedings were at one time instituted for the appointment of a committee to take charge of her estate, and she was advised by her attorney that if the proceedings were successful the right existed to place her in an asylum; these proceedings were arrested by the husband. *Held,* that the evidence failed to show the existence of any insane delusions, such as rendered the testatrix incompetent to make a will.

Also *held,* that in the absence of any direct proof of undue influence or of any direct inference to be drawn from the facts of such influence having been exercised, the motive to favor those toward whom her feelings were the most friendly, which was to be inferred from the circumstances, would rebut any presumption of undue influence to be drawn from the fact of intimate and confidential relations between her and one of her children thus favored; or from the fact that such child contributed to increase and keep alive the family differences.

(Argued June 15, 1879; decided September 16, 1879.)

Appeal from judgment of the General Term of the Supreme Court, in the second judicial department, affirming a decree of the surrogate of the county of Kings admitting to probate the will of Emily Coit.

The deceased was the wife of William A. Coit; they were

married in 1827 ; she died in June, 1875, at the age of sixty-seven years, leaving him and eight children her surviv. ing. Her will was executed August 1, 1874 ; she left about $150,000 in real estate. The nucleus of this property originally came from her husband, it being conveyed to her in settlement of a suit she had brought against him for divorce. In 1866, Mr. Grey, husband of Emily the eldest daughter of the testatrix died, and the widowed daughter returned home to her mother's house with an infant daughter. She continued there until 1869, when her mother bought a lot on which a house was built for Mrs. Grey. Mrs. Grey moved there, and her mother went with her, and continued there until her death.

By the will Mrs. Grey receives the house and lot, so bought for her, free of incumbrances, valued at about $14,000 ; Mrs. Patchen, another daughter, also receives a house and lot subject to incumbrances, worth $11,000 ; Frank Coit, a son, is given a cottage worth some $3,000, and John, another son, is given the life estate of a farm in Connecticut, worth from $500 to $1,000 per annum for his life. William A. Coit, her husband, receives a life estate in the house in which he lived at the time of her death, and the remainder of the estate is given to all the children equally, including as one of her children a grand-daughter, Jennie Miller.

The further facts appear sufficiently in the opinion.

*E. More*, for appellant. The will of the testatrix was void on account of the delusions she labored under and the fraud and undue influence that was exercised over her. (*Lewis* v. *Mason*, 109 Mass., 169–171; *Mowry* v. *Silber*, 2 Brad., 133, 147; Redf. on Wills [4th ed.], 535; 25 N. Y., 24, 25, 89, 95; *Lathrop* v. *Borden*, 5 Hun, 560; *Reynolds* v. *Root*, 62 Barb., 250; *Kinne* v. *Johnson*, 60 id., 75; *Furman* v. *Smith*, 7 Lans., 443, 448, 449; *Marvin* v. *Marvin*, 3 Abb. Ct. App. Dec., 203–205; 33 N. Y., 619; *Den* v. *Clark*, 3 Add. Ecc., 79, 640; Redf. Am. Cas. on Laws of Wills, 423; id. [4th ed.], 516, § 14; *Mountain* v. *Barnett*, 2 Hagg., 84–141;

*Eadie* v. *Shinmon*, 26 N. Y., 9; *Wheelan* v. *Wheelan*, 3 Cow., 537; *Tyler* v. *Gardner*, 35 N. Y., 559, 594, 595; *Stanton* v. *Witherwax*, 16 Barb., 260–263; *Den* v. *Clark*, 3 Add. Exec. R. [Eng. Ecc. R.], vol. 2, 441; *Dean* v. *Negley*, 41 Penn., 316; *Clapp* v. *Fullerton*, 34 N. Y., 190.)

*Edgar M. Cullen*, for respondents. In deciding as to testamentary capacity the question is, whether the testator was *compos mentis*. (*Delafield* v. *Parrish*, 25 N. Y., 97; *Van Guislings* v. *Van Kuren*, 35 id., 70; *Kinne* v. *Johnson*, 30 Barb., 71; *Reynolds* v. *Root*, 62 id., 250; *Bleecker* v. *Lynch*, 1 Brad., 458; *Wein* v. *Fitzgerald*, 2 id., 42; *Moore* v. *Moore*, id., 261; *Thompson* v. *Quimby*, id., 449; *Dean* v. *Wandell*, 3 N. Y. Sup. Ct., 128.) To set aside a will on the ground of undue influence, the ascendancy of another will over that of the testator, whose faculties have been so impaired as to subject him to the controlling influence of force, imposition or fraud, must be shown. (*Sequine* v. *Sequine*, 4 Abb. Ct. App., 198; *Clapp* v. *Fullerton*, 34 N. Y., 190; *Kinne* v. *Johnson*, 60 Barb., 75; *Bleecker* v. *Lynch*, 1 Brad., 458; *Gardner* v. *Gardner*, 34 N. Y., 162; *Hazard* v. *Hefford*, 2 Hun, 445.)

MILLER, J. The controversy in regard to the validity of the will in question upon this appeal embraces two objections. The first relates to the incompetency of the testatrix, by reason of delusions in reference to her husband and some of her children, which created a wrong impression upon her mind and induced her to make a discrimination against them in the disposition of her estate. The second has reference to alleged undue influence and fraud exercised over the mind of the testatrix by her daughter, Mrs. Grey, who, it is claimed, was the chosen object of her preference and her bounty in her last will. Both of these questions were severely contested before the surrogate, and the voluminous testimony now presented, embracing some 1100 pages, involves an inquiry into the family history and

affairs of the deceased from her marriage to the time of her death. The opinion of the General Term covers the main points in the controversy, and without referring in detail to the various facts developed by the evidence, it is sufficient, we think, briefly to recur to the general features which characterize the case. As to the first question, it must be conceded, we think, that the testatrix was a person of intelligence, considerable business capacity and, at any rate, up to the period when she was attacked by sickness in 1868, resembling somewhat, if not in fact, apoplexy or paralysis, was entirely competent to make a legal disposition of her property. Since that time there is a conflict in the testimony as to her condition; and, while it may be difficult to reconcile the statements of the different members of this family, which are strikingly in conflict, in reference to the effect of her sickness, it is by no means established that her mental condition was so much impaired or affected as to prevent the free exercise of her will in the disposition of her property. She continued to manage her business after this, executed conveyances, conversed intelligently with her friends and with her attorney, giving instructions to the latter as to her will and following in some respect his advice. She collected rents, directed improvements on her property, and virtually acted the same as she had previously done in the conduct of her affairs. No act of insanity or of improvidence, or wastefulness, in the management of her property is proven which leads to the conclusion that her mind was seriously impaired, or that she was laboring under any hallucination in this respect, or that she was wanting in capacity to make and execute a last will and testament.

The allegation of the contestants is that she labored under delusions; first, as to the conduct and affection of her husband in reference particularly to his supposed relations with other women; second, as to the want of affection of several members of the family and their desire to place her in a lunatic asylum; and third, her apprehension that her

daughter, Mrs. Grey, was in danger of coming to want, was ill treated, and that she was mainly indebted to Mrs. Grey, for protection and support from the dangers which threatened her. These alleged delusions, if they actually existed, may properly be considered as having had more effect since the sickness of the testatrix in 1868. The evidence as to the acts of the deceased in regard to her husband's affection are quite clear, and her demonstrations in this respect were carried to an extent that would indicate that this feeling exercised a strong control over her mind, so that upon one occasion she publicly struck him for looking at another female. It is not so clear, however, that this ebulition of passion and jealousy in a female could be regarded as an insane act of itself, which would render her incapable of executing a last will and testament for all future time ; for, in the language of England's immortal bard,

> " Trifles, light as air,
> Are to the jealous confirmations strong
> As proofs of holy writ."

Assuming, however, that it might, if no other cause existed for making an unjust discrimination against her husband, and that there was no sufficient ground for such conduct, tend to show that her mind was affected, yet when the history of her life evinced that she and her husband had been engaged in frequent quarrels during their married life; that they had repeatedly lived apart,—on one occasion for five years; that at one time a divorce suit was pending between them; and that her son had committed an assault upon her with a pistol, for which he and her husband were indicted and the son convicted; this single act cannot be considered as entirely controlling. The proof certainly does not establish the infidelity of the husband; and it may therefore be assumed that the deceased acted upon an unfounded suspicion as to his fidelity. But as other causes, as we have seen, co-operated to influence her judgment and action, which may have been sufficient to account for her discrimination as to him in making her will, it cannot,

we think, be said that this act of itself was conclusive upon the question of insane delusion. In regard to the conduct of her husband and children, and her belief that they desired to confine her in an asylum, it will not be denied that proceedings were instituted to have a committee appointed to take charge of her estate, of which the deceased had knowledge; and although the testimony establishes that the husband arrested these proceedings, it cannot, we think, be claimed that the deceased had not some ground for believing that she might be taken and confined in an asylum, and such belief was not a delusion, without any foundation whatever to rest upon. It may also be remarked that she was advised by her attorney that if the proceedings were successful, the right existed to place her in an asylum. If she was in error it does not establish that the deceased labored under an insane delusion because she believed what had been told her.

As to Mrs. Grey. In the bitter controversies which existed for years in this unfortunate family it is not to be disguised that she took an active part with her mother, who believed that she was treated unkindly. One of the other members of the family besides Mrs. Grey participated in this feeling, and thus in a quarrel of the most inveterate character a difference of opinion existed. While there is much to condemn in the conduct of all the parties, and Mrs. Grey certainly did not aid to soothe and assuage the deep feeling of hostility which more or less actuated each one of the children, it does not follow that an erroneous opinion, formed amid such a conflict of feeling and passion, was an insane delusion. In considering this branch of the case, it must not be overlooked that the deceased was a woman of strong will, who had passed a life of strife and turmoil, who had quarrelled with her husband, had a law suit with him, in some way obtained a conveyance of a portion of his estate, which was a subject of frequent controversy, and that she possessed marked peculiarities of disposition and character which might well control her conduct. In view of all the facts, I think it is not sufficiently established that the

deceased was laboring under any insane delusion in regard to the matters which have been the subject of discussion.

As to the question of undue influence, the charge made is that Mrs. Grey, by a persistent course of conduct, sought to prejudice her mother against the rest of the family, and by a pretended sympathy and by attentions to her wishes, succeeded in alienating her affections from most of the other members of the family, and thus induced her, especially after her sickness in 1868, to make the will in question.

The question of undue influence has been the subject of frequent consideration in the courts, and it is, we think, well defined as to what constitutes undue influence. In a recent case, *The Children's Aid Society* v. *Loveridge* (70 N. Y. 394), the subject is fully considered, and it is there said: "In order to avoid a will, upon any such ground, it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent, resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear: (1 Jarman on Wills, 36, 37; *Gardiner* v. *Gardiner*, 34 N. Y., 155, 162; *Seguine* v. *Seguine*, 3 Keyes, 663; *Brick* v. *Brick*, 66 N. Y., 144.) Gratitude, love, esteem or friendship which induces another to make testamentary dispositions of property cannot ordinarily be considered as arising from undue influence, and all these motives are allowed to have full scope, without in any way affecting the validity of the act. So, also, lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for

consideration in the disposition of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation."

There is no proof in the case considered that Mrs. Grey by direct importunity or otherwise induced the making of the will of the testatrix. It only can be claimed that she did so from inferences to be drawn from the circumstances surrounding the parties and the intimate and confidential relations which existed between herself and the testatrix. She was her favorite daughter, and almost invariably, during the many years of her troubled career, sustained and supported her mother's views. She also on various occasions contributed to increase the differences and difficulties which arose among different members of the family. She certainly was not a pacificator, but at times fanned the flame which had been kindled and which separated the children from their mother and the wife from the husband. But in thus scrutinizing her conduct it must not be forgotten that some other members of the family were liable to the same charge. Mutual dislikes and differences grew up and were increased, and quarrels were engendered which were marked by great acerbity and bitterness of feeling. To discuss them in detail would require great elaboration, far more than is necessary for a proper disposition of the case. The testatrix herself warmly entered into these quarrels, and possessed intelligence and determination sufficient to act without regard to any one else, without the interference of any one, and without any instigation of Mrs. Grey. She evidently had a will of her own, and we think that the unfortunate state of affairs which had existed, and in which she had participated, was quite sufficient to induce the discrimination which she made, without reference to Mrs. Grey. She had in her own mind at least sufficient cause and aggravation to make a discrimination, without being charged with being unduly influenced. She undoubtedly entertained a sense of wrong, as we may infer from the circumstances surrounding the case; and under

such an impression it is not unreasonable to suppose the will in question may have been executed, without regard to the influence of Mrs. Grey. As such a motive may well be inferred, it is enough to rebut the presumption of undue influence. It is not directly proved, as the testimony stands, nor is there any direct inference to be drawn from the facts which dispenses with proof. In the absence of proof, or circumstances equivalent to it, every intendment is in a contrary direction.

Cases arise where in extreme old age one member of a family obtains the control of a parent, and by importunity and insidious efforts controls the disposition of the estate to the exclusion of those who have equal claims upon the deceased. The law throws the shield of its protection around the aged and infirm under such circumstances, and will interpose to prevent the injustice which follows from such an unjust interference with the free act of the testator. (See *Delafield* v. *Parish*, 25 N. Y., 95; *Tyler* v. *Gardiner*, 35 id., 594; *Kinne* v. *Johnson*, 60 Barb., 69; *Forman* v. *Smith*, 7 Lans., 443.) And in such cases the court will interfere and thus prevent the consequences arising from undue influence and an improper control over the free action of the deceased.

The case at bar does not present the aspects which peculiarly mark the cases cited. The deceased was not of a very great age, and she was, according to the testimony, in possession of her faculties so as to make a valid will, and the devises made may all be accounted for without considering the question of undue influence. While the disposition made by the will would appear to be unjust towards the husband from whom the property was derived, and unequal in many other respects, it must not be overlooked that Mr. Coit still retains a life estate in a considerable portion of the property, and that he, as well as the children, with the exception of Mrs. Grey and Mrs. Patchen, had been in a position of hostility to the deceased. It may also be remarked, without entering upon a particular statement as to the various devises

made, that although inequality exists, yet it is not so gross and palpable as to show an entire disregard of the claims of any of her children. As her husband chose to part with his property to her, he vested her with the power to dispose of it as she wished; and, as it would seem, this was done in no friendly spirit by him, it is not remarkable, as the difficulties between the two continued afterwards, that he failed to conciliate her.

After a careful perusal of the testimony, and a full consideration of the arguments presented and the position of the testatrix to the parties, we cannot resist the conclusion that the will of the testatrix was her own free act, without being influenced unduly by Mrs. Grey or any other person.

While the contest in this case is to be deplored, and reflects no credit upon those who have participated in it, we see no ground for revoking the surrogate's decision, and the judgment should be affirmed. We are of the opinion, however, that as there was much reason for questioning the validity of the testatrix's will, that the costs of all the parties to the litigation should be paid out of the estate.

All concur, except ANDREWS, J., absent.

Judgment affirmed.